UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| CUSTOM TRUCK ONE SOURCE, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:22-CV-00046-HAB-SLC |
| | ) | |
| AARON NORRIS & NORRIS UTILITIES, LLC., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**OPINION AND ORDER**

On February 8, 2022, Custom Truck One Source, Inc. ("CTOS") filed its Verified Complaint with Jury Demand (ECF No. 1) asserting claims for breach of contract, misappropriation of trade secrets, and several other counts against its former employee, Aaron Norris ("Norris"), and his business, Norris Utilities, LLC ("Norris Utilities") (collectively, "Defendants"). Contemporaneous with the Complaint, CTOS moved for a Temporary Restraining Order and Preliminary Injunction ("the Motion") (ECF No. 2) and requested expedited discovery (ECF No. 6).[1] CTOS seeks to enjoin Defendants from continuing their allegedly wrongful acts, including using CTOS' confidential information to compete with CTOS and solicit CTOS customers.

The parties have briefed the Motion and agreed that the Court may resolve the issues presented in the Motion based on the briefing. (Briefs, ECF Nos. 3, 30, and 32). Because the Court

---

[1] After reviewing the Verified Complaint, the Motion, and the supporting memorandum, the Court ordered the parties to file simultaneous briefs addressing whether this Court should exercise jurisdiction given the existence of a concurrent proceeding between the parties filed in Alabama state court. On February 16, 2022, this Court entered an Opinion and Order Accepting Jurisdiction (ECF No. 18) and set the case for a status conference. At the status conference, the Court ordered briefing on the Motion and authorized expedited discovery. (ECF No. 25).

finds that CTOS has not met its burden to obtain a TRO, the Court will DENY the Request for Temporary Restraining Order. The request for Preliminary Injunction will remain under advisement with a hearing set on March 10, 2022, at 9:30 a.m.

## FACTUAL BACKGROUND

### 1. *The Parties*

CTOS is a single-source provider of specialized truck and heavy equipment solutions to the utility, telecommunications, rail, and infrastructure markets in North America. (Compl. ¶14). It is a publicly traded entity with over $1 billion in annual revenue, over 37 locations, and over 1800 employees.[2]

On September 1, 2014, Norris, an Alabama resident, was hired as an account manager by NESCO LLC ("NESCO"),[3] CTOS' predecessor, to manage the Southeast territories which included Alabama, Arkansas, Louisiana, and Mississippi. (*Id.* ¶¶ 20-21). In April 2021, NESCO's parent company acquired "Custom Truck One Source" and the companies merged to become CTOS.

Norris Utilities is an Alabama business formed by Norris after he resigned his position at CTOS. (Norris Aff., ECF No. 30-3, ¶ 17). Norris Utilities' business is limited to the sale and rental of utility equipment. (*Id.* ¶ 19).

### 2. *Retention and Release Agreement*

On March 5, 2015, while an employee of NESCO, Norris signed a Confidential Retention and Release Agreement ("Agreement") with NESCO. (Compl., ECF No. 1-1, Ex. A). The

---

[2] This information is publicly accessible on CTOS' website. See About Custom Truck One Source – Custom Truck One Source.

[3] NESCO provided sales, rentals, parts, and repairs of specialty equipment. (Def's Resp., ECF No. 30, ¶ 3).

2

Agreement includes several restrictive covenants relevant to the present litigation – a non-competition provision, a non-solicitation provision, and a confidentiality provision. (*Id.* ¶¶s 11-12). A choice of law provision incorporated in the Agreement also provides that it "shall be governed by and construed and enforced in accordance with the laws of the State of Indiana, without application of its conflict of law principles." (*Id.* ¶ 18).

The relevant restrictive covenants are found in paragraphs 11 and 12 of the Agreement. Paragraph 11(a) contains the restrictions on competition:

> (a) <u>Non-Competition</u>. During the term of the Employee's employment with the Company and for a period of one (1) year following the termination or conclusion of the Employee's employment, for any reason and however terminated or concluded, the Employee shall not, directly or indirectly, within the parishes in the State of Louisiana and the counties in the other states in which Employee actively worked and/or sought business for Company that are listed in <u>*Exhibit B*</u>[4] ["the Territories" or "the Territory"] attached hereto:
>
> i. Serve as owner, officer, director, manager, stockholder, investor, proprietor, or organizer of any other business, partnership, proprietorship, firm, entity, organization, or corporation that is in substantially the same business as the Company or in a business substantially competitive with the Company, or
>
> ii. Serve as employee, agent, representative, consultant, or independent contractor, or otherwise perform services for or render assistance to, in a similar capacity as Employee performed with Employer, with any other business, partnership, proprietorship, firm, entity, organization, or corporation that is in substantially the same business as the Company or in a business substantially competitive with the Company.

(Agreement, ¶ 11(a)). Paragraph 11(b) contains the prohibitions on solicitation:

> (b) <u>Non-Solicitation.</u> During the term of the Employee's employment and for a period of one (1) year following the termination or conclusion of the Employee's employment, for any reason and however terminated or concluded, the Employee shall not, directly or indirectly, either for his own benefit or the benefit of any other person or entity:

---

[4] The counties and parishes listed in Exhibit B of the Agreement include counties in Arkansas, Alabama, Louisiana, and Mississippi.

      i. solicit or attempt to solicit any customer of the Company with whom Employee had any contact during the final twelve (12) twelve months of his employment; or

      ii. advise, encourage, suggest, or induce, or attempt to advise, encourage, suggest, or induce, any customer of the Company, who was a Customer during the final twelve (12) months of his employment, to terminate, reduce, limit, or change in any way, their business or relationship with the Company or

      iii. solicit or induce, or attempt to solicit or induce, any employee or contractor of the Company to terminate such employee's employment or such contractor's relationship with the Company, or hire, employ, engage or offer, or otherwise provide, employment (whether such employment is with the Employee or any other business or enterprise), either on a full-time or part-time or consulting basis, to any person who currently is an employee or contractor of the Company.

(*Id.* ¶11 (b)).

The use or dissemination of confidential information[5] by Norris is restricted in Paragraphs 12(a) and 12(b):

    a. During the course of the Employee's employment with the Company, the Employee will become knowledgeable about and in possession of, Confidential Information. If such Confidential Information were to be used, divulged or become known to any competitor of the Company or to any other person outside the employ of the Company, the Company would be irreparably harmed. In addition, the Employee will develop relationships with customers which could

---

[5] Confidential information is defined as follows:

The term "Confidential Information" as used herein shall mean any and all customer lists and related material and information, vendor lists and related material and information, pricing lists and related material and information, trade secrets (as defined by applicable law including Indiana Code Section 24-2-3-2 and any amendments thereto), know-how, skills, knowledge, ideas, sales and marketing techniques, rental methods, financial information, business plans, business methods, intellectual property, research, development, processes, systems, methods, documentation, or devices used in or pertaining to the business of the Company, which are unique to the business or services of the Company.

(Agreement, ¶ 12).

      be used to solicit the business of such customers away from the Company. The Parties have entered into this Agreement to guard against such potential harm.

    b. The Employee shall not, directly or indirectly, use any Confidential Information for any purpose other than the benefit of the Company or communicate, deliver, exhibit, or provide any Confidential Information to any person, firm, partnership, corporation, organization, or entity, except other employees or agents of the Company as required in the normal course of the Employee's service as an employee of the Company.

In exchange for his agreement to the above provisions, Norris received a "Retention Payment" of up to $50,000, 3,000 units of "Phantom Stock" (Phantom Stock Participation Plan), and continuing compensation in the form of a base salary, "as well as any commissions he has earned under the commission plan then in effect." (Agreement, ¶¶'s 1, 2, 4 and Grant Agreement, ECF No. 2-2, Ex. A).

### 3. *Norris' Employment with CTOS, the Formation of Norris Utilities and its Activities*

Things did not go well for Norris once NESCO and Custom Truck One Source integrated their businesses in April 2021. Norris contends that CTOS removed him from his long-standing customers and assigned them to other salespeople, depriving him of commissions. He also alleges that CTOS withheld commission information and documentation from him.[6] (Norris Aff. ¶ 13 and ECF No. 30-8). Email communications between Norris and CTOS dated in October and November 2021 convey Norris' attempts to determine commissions owed to him. Fed up, on November 5, 2021, Norris voluntarily resigned his employment from CTOS.

Before his resignation, Norris reserved the name Norris Utilities, LLC, with the Alabama Secretary of State. (Norris Aff. ¶ 14). CTOS also asserts that Norris tried to sell equipment to at least one of its customers, Mississippi Power, prior to his resignation. CTOS contends that this

---

[6] Norris also contends that CTOS did not comply with its obligations to provide him Phantom Stock as explained in the Agreement.

conduct was a breach of Norris' fiduciary duty of loyalty to CTOS and constitutes tortious interference with prospective economic relations.

On November 9, 2021, Norris incorporated Norris Utilities in Alabama by filing a Certificate of Formation and naming himself as the registered agent using his Alabama address. (Certificate of Formation, ECF No. 2-5). CTOS asserts that this conduct violates the non-competition provisions in the Agreement and that Norris Utilities engages in substantially the same business as CTOS.

On January 6, 2022, Norris emailed Condux Tesmec, a CTOS vendor, to inquire about pricing to obtain equipment for Norris Utilities to provide to its customers. (ECF No. 3, ¶ 32). CTOS contends "upon information and belief" that after leaving his employment and forming Norris Utilities, Norris solicited business from its customers including, Mississippi Power, Pike Utilities ("Pike"), Southern Electric Corporation, Chain Electric, the Los Angeles Department of Water and Power, and Alabama Power Company. (ECF No. 3, ¶ 33). This conduct, according to CTOS, violates the non-solicitation provisions of the Agreement.

On January 7, 2022, CTOS sent a cease-and-desist letter to Norris. In response to the cease-and-desist letter, the parties engaged in negotiations. Those negotiations failed and the parties resorted to a state court in Alabama and this Court to resolve their respective disputes.

## DISCUSSION

### A. Legal Standard

In deciding whether to grant a motion for TRO, courts look to substantially the same factors that apply to a court's decision on whether to issue a preliminary injunction. *J.P. Morgan Sec. LLC v. Weiss*, 2019 WL 6050176, at *4 (S.D. Ind. Nov. 15, 2019) (citing *Loveless v. Chicago Bd. of Election Commissioners*, 2004 WL 2095662, at *2 (N.D. Ill. Sept. 17, 2004)). To obtain a TRO, the movant has the burden to show: (1) a likelihood of success on the merits; (2)

irreparable harm; and (3) that the balance of the equities and the public interest favors emergency relief. *Winter v. Nat. Res. Def. Council,* 555 U.S. 7, 22 (2008). The Court then weighs these factors in what the Seventh Circuit has called a "sliding scale" approach. That is, "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018) (internal quotation marks omitted). And "[w]here appropriate, this balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the 'public interest')." *Id.* Because a TRO is an extraordinary and drastic remedy it "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original); *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005); *see also Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (granting preliminary injunctive relief is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it").

With this standard in mind, the Court now turns to CTOS' request for a temporary restraining order.

B. Legal Analysis

1. **Plaintiff's Likelihood of Success on the Merits**[7]

Under the likelihood of success analysis, the plaintiff must show "more than a mere possibility of success" but need not show that it will "definitely win the case." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). The plaintiff faces a "significant burden" that

---

[7] As this district court is sitting in diversity and the parties have agreed to Indiana law in the Agreement, the substantive law of Indiana applies to this claim. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938).

stops short of requiring proof by a preponderance of the evidence but nonetheless requires a strong showing. *Id.* at 763. That showing "normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id.*[8] Applying this standard, the Court finds that CTOS has not made such a showing.

  a. **Breach of Contract**

To prevail on a claim for breach of contract, CTOS must show: (1) the existence of a valid contract; (2) the Defendants' breach of the contract; and (3) damages. *Roche Diagnostics Operations, Inc. v. Marsh Supermarkets, LLC*, 987 N.E.2d 72, 85 (Ind. Ct. App. 2013). CTOS asserts that the Defendants breached and continue to breach the restrictive covenants in paragraphs 11 and 12 of the Agreement. Defendants, in turn, attack this assertion on multiple grounds. First, they dispute that Norris violated the restrictive covenants; second, they contend that even if they are in breach, the covenants are unenforceable; third, they contend that CTOS violated the payment provisions in the Agreement and thus committed a material first breach which voids the covenants. The Court turns first to an analysis of the various covenants in the Agreement.

  i. **The Non-Competition Provisions**

"Covenants not to compete are contractual provisions which might be described as stepchildren of the law." *Seach v. Richards, Dieterle & Co.*, 439 N.E.2d 208, 211 (Ind. Ct. App. 1982) (*modified by Dicen v. New Sesco, Inc.,* 806 N.E.2d 833 (Ind. Ct. App. 2004)). An employer "has no right to unnecessarily interfere with the employee's following any trade or calling for which he

---

[8] In *Pritzker,* the Seventh Circuit reviewed the standard for issuance of injunctive relief given recent Supreme Court precedent. In answering the question of "how likely must the success on the merits be to satisfy the standard," the panel reminded "both the district courts and ourselves that the 'better than negligible' standard was retired by the Supreme Court." Rather, an applicant for preliminary relief bears a significant burden to show a likelihood of success on the merits. *Pritzker*, 973 F.3d at 763.

is fitted and from which he may earn his livelihood and he cannot preclude him from exercising the skill and general knowledge he has acquired or increased through experience or even instructions while in the employment." *Donahue v. Permacel Tape Corp.,* 127 N.E.2d 235, 241 (Ind. 1955). For this reason, "[p]ost-employment restraints are scrutinized with particular care because they are often the product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through loss of his livelihood." Restatement (Second) of Contracts, § 188 cmt. G (1981).

Because covenants not to compete "are in restraint of trade, courts enforce them only if they are reasonable." *Heraeus Med., LLC v. Zimmer, Inc.*, 135 N.E.3d 150, 153 (Ind. 2019) (quotation omitted); *Cent. Indiana Podiatry, P.C. v. Krueger,* 882 N.E.2d 723, 728–729 (Ind. 2008) ("This Court has long held that non-competition covenants in employment contracts are in restraint of trade and disfavored by the law."). Covenants must be reasonable with respect to the legitimate interests of the employer, restrictions on the employee, and the public interest. *Titus v. Rheitone, Inc.,* 758 N.E.2d 85, 91–92 (Ind. Ct. App. 2001). The determination of reasonableness is a question of law. *Krueger,* 882 N.E.2d. at 729.

In determining the reasonableness of the covenant, the Court first examines whether the employer has asserted a legitimate interest that a covenant may protect. *Krueger,* 882 N.E.2d at 728, *Titus,* 758 N.E.2d at 92. If the employer has asserted a legitimate, protectable interest, the Court may then determine whether the scope of the agreement is reasonable in terms of time, geography, and types of activity prohibited. *Krueger,* 882 N.E.2d at 729, *Titus,* 758 N.E.2d at 92. The employer bears the burden of showing that the covenant is reasonable and necessary given the circumstances. *Titus,* 758 N.E.2d at 92. "In other words, the employer must demonstrate that the employee has gained a unique competitive advantage or ability to harm the employer before such

employer is entitled to the protection of a non-competition agreement." *Gleeson v. Preferred Sourcing, LLC,* 883 N.E.2d 164, 172 (Ind. Ct. App. 2008) (citing *Titus,* 758 N.E.2d at 92).

The non-competition provision includes two components: first, Norris is restricted from acting in any official corporate capacity or as an organizer of any business in the Territory that is in substantially the same business as CTOS or in a business substantially competitive with CTOS. This is true without regard to whether the business competes solely outside the Territory. As CTOS construes it, the mere formation of a business inside the Territory, as Norris did here, violates the covenant no matter if the business activities occur inside or outside the Territory.

Second, Norris is restricted from serving as an employee in a similar capacity as he performed with CTOS, in substantially the same business as CTOS, or in a business substantially competitive with CTOS in the Territory.

Defendant asserts that these provisions are unenforceable because they are vague and ambiguous. Additionally, Defendant asserts that CTOS does not have a protectable interest merely in the place where a business establishes itself. Rather, it contends that the protectable interest is where the business competition occurs. CTOS contests this interpretation and repeatedly asserts that it has a legitimate interest in its goodwill, and business and confidential information, built by its well-established business and customers within the Territory.

In principle, the Court has no quarrel with CTOS that a business' goodwill is a legitimate business interest that an employer may protect. *Krueger,* 882 N.E.2d at 729 ("[T]he advantageous familiarity and personal contact which employees derive from dealing with an employer's customers are elements of an employer's 'good will' and are a protectable interest which may justify a restraint...."). But "[g]oodwill must be related to the transaction between the parties."

*Donahue,* 127 N.E.2d at 238. If the restraint is greater than is necessary to protect the goodwill, the restraint is invalid. *Id.* And therein lies the rub.

Norris argues that while he formed an LLC inside the Territory, he's not competing inside it. His only customer is Pike, located in North Carolina, and the jobs Norris Utilities is servicing for Pike are in Florida – both outside the Territories in the Agreement. In his view then, there is no imposition on CTOS' goodwill because he is not engaging in prohibited competition in the Territory. In retort, CTOS asserts "it is from Alabama that Norris Utilities conducts business – to wit, Norris makes calls or sends emails to clients or potential clients and arranges or brokers deals for the rental of utility equipment." (ECF No. 35 at 5-6).

"To demonstrate a legitimate protectable interest, an employer must show some reason why it would be unfair to allow the employee to compete with the former employer.'" *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 913 (Ind. Ct. App. 2011). Indeed, "the employee should only be enjoined if he has gained some advantage at the employer's expense which would not be available to the general public." *Norlund v. Faust,* 675 N.E.2d 1142, 1154 (Ind. Ct. App. 1997). While the Court agrees that Norris' formation of an entity inside the Territory, and perhaps his conducting routine business such as emails and calls from within the Territory, constitutes "the conduct of business," the line blurs and invites inquiry into what legitimate interest of CTOS is implicated when that routine business is directed to customers outside the Territory in the Agreement.

In the circumstances presented here, the language of the parties' non-competition provision invites questions. What legitimate interest is CTOS protecting by prohibiting Norris from competing in locations outside the Territory? What unfair competitive advantage does Norris receive from the place from which he generates emails if the customers receiving the emails are

located outside the Territory? What is the competitive significance of Norris incorporating in the state where he resides if he's directing his competitive activities (even if it is from his home within the Territory) outside the Territory? Does Norris gain some unfair competitive advantage over CTOS by sitting in his living room in Alabama that he would not have if he were sitting in a cabana in Florida, using his cell phone to make calls and send emails to customers? These are serious questions in the global marketplace, and the Court must grapple with them to discern the enforceability and reasonableness of the non-competition provision here. Simply put, the Court fails to see how Norris is in a better competitive position by incorporating and making emails and phone calls that do not violate the non-solicitation provision and do not involve the Territory, than he would if he performed the same tasks anywhere else in the world. CTOS' interest is in protecting against unfair competition; it has no right to protection from ordinary competition. 54A Am. Jur. 2d Monopolies, Restraints of Trade, and Unfair Trade Practices § 888; *Union Home Mortg. Corp. v. Jenkins*, 2021 WL 1979517, at *6 (N.D. Ohio May 18, 2021) ("[t]he purpose in allowing noncompetition agreements is to foster commercial ethics and to protect the employer's legitimate interests by preventing *unfair* competition-not ordinary competition.")

Given these novel issues, the preliminary record, and the lack of a showing by CTOS that Norris "has gained a unique competitive advantage or ability to harm the employer," *Gleeson*, 883 N.E.2d at 172, from the place where he makes phone calls and emails, the Court cannot conclude that the non-competition provision in ¶ 11(a)(i) is an enforceable restriction as written. In turn, the Court cannot find that Plaintiff has met its strong burden of showing a likelihood of success on the merits. *See Wagler Excavating Corp. v. McKibben Const., Inc.,* 679 N.E.2d 155, 157–158 (Ind.Ct.App.1997) (stating that "Indiana courts will not hesitate to strike down any such restrictive covenants which are the least bit overly broad with respect to the 'protectible interest' at stake,"

and that "[w]here the underlying protectible interest is minimal, courts will closely scrutinize the terms of the restraint").

### ii. Non-Solicitation Provisions

Plaintiff has also failed to meet its evidentiary burden to show a breach of the non-solicitation provisions of the Agreement. Plaintiff urges "upon information and belief"[9] that Defendants have violated the non-solicitation provisions by soliciting or trying to solicit at least six CTOS customers since Norris' resignation including, Mississippi Power, Pike, Southern Electric Corporation, Chain Electric, the Los Angeles Department of Water and Power, and Alabama Power Company. (ECF No. 3 ¶ 33). In response, Norris agrees that he has Pike as a client but disavows any attempts to solicit, or actual soliciting, the other customers CTOS references. (Norris Aff. ¶¶'s 20, 26).

The non-solicitation provisions limit Norris' ability to solicit any customer with whom he had contact during the final 12 months of his employment (Agreement, ¶11(b)(i)), and prohibit him from advising, encouraging, suggesting, or inducing *any CTOS customer* in the last 12 months of his employ to "terminate, reduce, limit, or change in any way, their business or relationship" with CTOS. (*Id.* ¶11(b)(ii)) (emphasis added). In essence, this latter provision is simply an expansive way of prohibiting Norris from engaging with and soliciting any customer of CTOS that was a customer in the last 12 months of Norris' employment.

CTOS makes an unsupported assertion that Pike, Norris' only client, was a CTOS customer in the last 12 months and that Norris breached paragraph 11(b)(ii) by renting equipment to Pike. CTOS points out that "present customers" are a protectable interest, *Seach*, 439 N.E.2d at 213, and

---

[9] A complaint may make allegations upon information and belief where the facts are inaccessible to the plaintiff, but it must also plead reasonable grounds for its suspicions. *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683–84 (7th Cir. 1992).

argues that it included this provision to protect its business "from encroachment by former employees competing in the same market." Defendants, in turn, acknowledge that Pike was a customer of CTOS but emphasize that it was not a customer of Norris' during the last twelve months of his employment. Having reviewed the language of ¶11(b)(ii), the Court finds it is overly broad and unenforceable.

The Indiana Court of Appeals decision in *Clark's Sales and Service, Inc. v. Smith.* 4 N.E.3d 772 (Ind. Ct. App. 2014), is instructive. There, the non-solicitation provision prohibited the employee from soliciting or providing competitive services to anyone who was a customer of the employer during the employee's long term of employment. *Id.* at 782. The court found that applying the non-solicitation provision to all customers, whether the employee had contact with them, was overly broad and unenforceable.[10]

The non–solicitation provisions here have a twelve-month time constraint which would seemingly avoid part of the overbreadth problem found by in *Clark's Sales.* But paragraph 11(b)(ii), sought to be enforced by CTOS, goes further and applies to "any customers" of CTOS in the last twelve months and was not limited to customers with whom Norris had contact. Nor is there any geographic restriction relating to paragraph 11(b)(ii) – any customer of CTOS, wherever located, and without regard to Norris' sales territory is implicated – not simply customers with whom he had contact and possessed knowledge which would give him a competitive advantage. The Court has concerns that this expansive customer base is so overly broad and onerous that it

---

[10] In *Heraeus Med., LLC*, the Indiana Supreme Court addressed a non-solicitation covenant, which Zimmer, Inc., the employer, drafted and which prohibited its employee, Robert Kolbe, from recruiting Zimmer employees to work for a competitor. 135 N.E.3d at 152. The Court held that "[a]s written, the Kolbe Agreement's employee non-solicitation covenant is overbroad because it applies to all Zimmer employees." *Id.* at 153. The Court upheld the appellate court's finding that the covenant, as written, was unreasonably broad because it extended to "any individual employed" by Zimmer—not just to those who had access to or possessed any knowledge that would give a competitor an unfair advantage.

would be an undue restriction on Norris' rights. *Clark's Sales*, 4 N.E.3d. at 782 ("[A] covenant that restricts the employee from competing with portions of the business with which he was never associated is invalid."). This restriction also imposes an unreasonable requirement on Norris to know all CTOS customers worldwide and to discern whether they have done business with CTOS through any of its more than 1,800 employees in the last year. This type of restriction is broader than necessary to protect CTOS' legitimate interests. For this reason, the Court simply cannot find that CTOS has shown a likelihood of success on its claim that Norris breached the non-solicitation provisions.[11]

### iii. Confidentiality Provision

CTOS' final argument is that Defendants breached the confidentiality provision when they contacted Pike. (ECF No. 35 at 8). The confidentiality provision prohibits Norris from directly or indirectly using confidential information as defined in the Agreement for the benefit of anyone other than CTOS. (Agreement, ¶ 12). Once again, the Court faces sparse allegations from CTOS. It states, "upon information and belief Defendants are using CTOS confidential information, including but not limited to pricing information and customer contact information, other than for the benefit of CTOS." (ECF No. 2 at 28). The problem with this assertion is that, contrary to the Seventh Circuit's guidance in *Pritzker*, CTOS has not said how it intends to succeed on this claim. *See Pritzker*, 973 F.3d at 763 (holding that a strong showing sufficient to show a likelihood of success on the merits "normally includes a demonstration of how the applicant proposes to prove the key elements of its case."). The Court has no such demonstration before it and thus it cannot

---

[11] Even if the provision were not overly broad and unenforceable, the Court has no evidence or anticipated evidence that Pike rented the same products, in the same locations, from CTOS that it now rents from Norris. Nor is the Court aware of any facts showing that, by renting equipment to Pike, Norris somehow altered the relationship between Pike and CTOS.

authorize injunctive relief based on speculation. CTOS has not shown a likelihood of success on its assertion that Norris breached the confidentiality provisions of the Agreement.[12]

### iv. Severability

If the Court finds one or more of the restrictive covenants unenforceable, CTOS argues that the severability provision in the Agreement operates to enforce the remaining provisions that the Court does not find objectionable. That provision states:

> Agreement is Separate and Divisible. The provisions of this Agreement are severable, and the invalidity of any one or more provisions shall not affect or limit the enforceability of the remaining provisions. Should any provision or covenant of this Agreement be held unenforceable for any reason, then such provision or covenant shall be enforced to the maximum extent permitted by law.

(Agreement, ¶ 16). The parties spend limited time discussing the effect of this provision on the restrictions and have not had the benefit of reviewing this Opinion and Order to make their respective arguments on whether: (1) severability is appropriate; and, (2) if it is, have the Defendants violated the remaining restrictions. Preliminarily, this Court has concluded that CTOS has not established a likelihood of success that Norris breached any of the restrictive covenants. The Court need not, at this stage, go further and address severability.

### b. Breach of Fiduciary Duty

An employee owes his employer a fiduciary duty of loyalty. *Kopka, Landau & Pinkus v. Hansen,* 874 N.E.2d 1065, 1070 (Ind. Ct. App. 2007). To that end, an employee who plans to leave his current job and go into competition with his current employer must walk a fine line. *Id.* Prior to his termination, an employee must refrain from actively and directly competing with his employer for customers and employees and must continue to exert his best efforts on behalf of his

---

[12] Given this Court's discussion above, the Court need not address the Defendants' assertion of first material breach by CTOS or the potential effect of the "no defense" provision at this stage.

employer. *Id.* An employee may prepare to compete with his employer; he can make investments or purchase a rival corporation or equipment. *Id.* However, the employee cannot improperly use confidential information specific to his employer's business before the employee leaves his employ. *Id.* These rules balance the concern for the integrity of the employment relationship against the privilege of employees to prepare to compete against their employers without fear of breaching their fiduciary duty of loyalty. *Id.* at 1070–1071.

The parties agree that Norris reserved the business name of Norris Utilities before resigning from CTOS. That's all folks. That is all the evidence the Court has that is not based on conjecture or "upon information or belief." CTOS has made allegations; but allegations with no corresponding proof do not provide a "strong showing" sufficient to warrant emergency injunctive relief. The Court is left with the undisputed evidence that Norris reserved a corporate name while still employed by CTOS. As stated above, an employee does not violate the duty of loyalty by preparing to compete against his employer. Thus, CTOS has not shown a likelihood of success on the merits.

### c. **Tortious Interference with Prospective Economic Advantage**

CTOS asserts that because of his position as a senior account manager at CTOS, Norris was "intimately aware of and responsible for maintaining customer relationships." (ECF No. 3 at 16). Thus, when he allegedly tried to broker sales for Norris Utilities while employed by CTOS, Norris tortiously interfered with their business.

Under Indiana law, the elements of a cause of action for tortious interference with a prospective economic advantage include: (1) the existence of a business relationship, (2) the defendant's knowledge of the existence of the relationship, (3) the defendant's intentional interference in the relationship, (4) the absence of any justification, and (5) damages resulting from the defendant's interference. *See Wright v. Associated Ins. Cos. Inc.,* 29 F.3d 1244, 1252 (7th Cir.

1994); *Furno v. Citizens Ins. Co. of Am.,* 590 N.E.2d 1137, 1140 (Ind. Ct. App. 1992). In addition, "it is critical that the defendant acted illegally in achieving his end." *Economation, Inc. v. Automated Conveyor Systems, Inc.,* 694 F. Supp. 553, 556–57 (S. D. Ind. 1988) (citations omitted).

Indiana has not clarified what type of conduct is needed to show "illegal conduct." The Seventh Circuit has rejected the implication that only a criminal act may be "illegal conduct," *Syndicate Sales, Inc. v. Hampshire Paper Corp.,* 192 F.3d 633, 641 (7th Cir. 1999), but aside from that guidance, "[i]llegality is not a term of art, and no court has defined the meaning of 'illegal' as used in this context." *See Gaskins v. Vencor, Inc.,* 2001 WL 300517, at *26 (S.D. Ind. Mar. 26, 2001). At least one Indiana court has noted that "[d]espite the lack of a definition or test for a showing of the 'illegal conduct' element of tortious interference with a business relationship, case law does not support a finding that defamation constitutes illegal conduct." *Levee v. Beeching,* 729 N.E.2d 215, 222–23 (Ind. Ct. App. 2000). Nevertheless, CTOS asserts that an employee's breach of fiduciary duty, such as the one alleged here against Norris, constitutes the type of illegal conduct that would qualify.

Even if this Court were to determine that a breach of fiduciary duty would qualify as the type of "illegal activity" to support a claim for tortious interference with a business relationship under Indiana law, the Court cannot conclude that CTOS has established it. As the Court stated above, CTOS has not provided the Court with the type of showing *Pritzker* contemplates to obtain a TRO on any claim of breach of fiduciary duty. Thus, the Court cannot find a likelihood of success on the merits of this claim.

    d. <u>Misappropriation of Trade Secrets Claims</u>

The Defend Trade Secrets Act (DTSA), 18 U.S.C. §1836 *et seq.,* a relatively recently enacted statutory regime which took effect in 2016, authorizes "[a]n owner of a trade secret that is misappropriated" to bring a civil suit under federal law. Likewise, the Indiana Uniform Trade

Secrets Act (IUTSA), Ind. Code. § 24-2-3-1 *et seq.*, codifies and governs claims for misappropriation of trade secrets under Indiana law. The elements of misappropriation claims under the DTSA and IUTSA are similar, *Magnesita Refractories Co. v. Mishra*, Case No. 2:16-cv-542-PPS-JEM, 2018 WL 6435648, at *12 (N.D. Ind. Dec. 7, 2018), and the parties do not argue otherwise in their filings. Further, both the DTSA and IUTSA provide that "actual or threatened misappropriation" of trade secrets may be enjoined. 18 U.S.C. § 1836(a)(3)(A)(i); Ind. Code § 24-2-3-3(a).

"Mere possession of trade secrets does not suffice to plausibly allege disclosure or use of those trade secrets." *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1066 (N.D. Ill. 2020); *Indus. Packaging Supplies, Inc. v. Channell*, , 2018 WL 2560993, at *2 (N.D. Ill. June 4, 2018) (holding that allegations that the defendants, former employees with access to trade secrets, left for a competitor offering the same services to the same clientele are "not enough to justify [the plaintiff's] otherwise unsupported suspicions that the defendants used or disclosed" trade secrets). Indeed, having access to trade secrets and misappropriating trade secrets are two different allegations.

As with the alleged violation of the confidentiality provision of the Agreement, CTOS speculates that Norris is using confidential information such as customer lists and pricing information to compete against it. CTOS has offered no actual evidence to the Court that Norris possesses such information, let alone that he has used or threatened its use. Nor has it countered Norris' affidavit in which he avers that he "was never told nor made aware of how CTOS came up with their rental prices or sales prices," that the formulas for this information were confidential, and he lacked access to the formulas or customer lists. (Norris Aff. ¶ 12). The Court has not been merely asked to review the Complaint on a motion to dismiss under Fed. R. Civ. P. 12(b)(6);

instead, CTOS has requested "extraordinary and drastic" emergency relief. With no showing of misappropriation or threatened misappropriation, the Court cannot conclude that CTOS is likely to succeed on the merits of this claim.

### e. Summary

CTOS' inability to show a likelihood of success on the merits is, by itself, sufficient to warrant denial of a TRO. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) (citing *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992)). The Court need not address the remaining prongs of the TRO analysis.

### CONCLUSION

For the reasons set forth above and on the record before it, the Court DENIES the Motion for Temporary Restraining Order (ECF No. 2). The request for a preliminary injunction remains pending and will be heard on March 10, 2022, at 9:30 a.m.

SO ORDERED on February 28, 2022.

s/ *Holly A. Brady*
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT